FILED
COURT OF APPEALS
DIVISION II

2013 APR 23 PM 12: 00

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42021-0-II |
| Respondent, | |
| v. | |
| VERONICA WITTEN, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, A.C.J. — Veronica Witten appeals her jury convictions for attempted first degree murder—domestic violence, first degree burglary—domestic violence, and a restraining order violation. Witten argues that the State engaged in prosecutorial misconduct by improperly questioning witnesses about her silence and by referring to her silence in closing arguments. Witten also argues that the jury was biased. We affirm Witten's convictions because Witten failed to preserve the alleged prosecutorial misconduct for review and her jury bias arguments either lack merit or lack an adequate record for review.

## FACTS

Michael[1] and Witten were married and both served in the United States Army. The marriage experienced difficult periods, the couple often lived apart, and Witten eventually sought counseling for depression. Witten told mental health professionals that Michael was physically and verbally abusive. The couple separated in April 2008 when Michael was deployed to Iraq.

---

[1] We refer to Michael Witten by his first name for clarity, intending no disrespect.

In July 2009, Michael returned and Witten served him with divorce papers. The superior court entered mutual restraining orders.

One day in December 2009, Michael arrived home and found his new girlfriend, Anna Meuangkhot, in the kitchen making dinner. Michael stepped outside, saw someone approaching, and immediately knew it was Witten. Witten said she bet that he did not expect to see her ever again and Michael told her that she was not supposed to be there. Witten replied, "I know." 3 Verbatim Report of Proceedings (VRP) at 343. Michael re-entered the apartment. As Michael tried to lock the door, he observed Witten outside holding a handgun. Witten shot Michael in his abdomen and then aimed the gun toward Meuangkhot. Michael struggled with Witten and took the gun from her. Witten then "walked off all nonchalant" to a grayish-colored vehicle, one that Michael thought was a rental car, and slowly drove off. 3 VRP at 352. Michael later told Deputy Inga Carpenter that he had been shot by his estranged wife and another deputy found the gun on the floor next to Michael.

Deputy Brian Heimann was dispatched to Witten's address and soon saw a red Toyota Celica approach. Knowing that Witten owned a red Toyota, he stopped the vehicle, took Witten into custody, and read her *Miranda*[2] warnings. Deputy Heimann asked Witten if she was willing to speak and she declined.[3] Deputy Heimann then transported her to and eventually booked her in the Pierce County Jail. Detective James Loeffelholz searched Witten's vehicle and found (1) a receipt for a silver rental car that had been rented a few days before the shooting and was returned to the nearby rental facility on the evening of the shooting, (2) a black baseball cap, (3)

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Deputy Heimann's testimony about this was during trial testimony in front of the jury.

black shoes, and (4) a 9 mm cartridge. At the jail, Witten asked Deputy Heimann how Michael was doing and if someone could check on her dogs. Michael later gave Detective Loeffelholz a receipt for a 9 mm handgun that he found in Witten's car and paperwork he found in Witten's home showing that she had hired a private investigator in September 2009 to find out where he was living and other details about him.

The State charged Witten with attempted first degree premeditated murder, first degree burglary, and violating a restraining order. Both counts included a firearm enhancement. The State later filed an amended information which added a domestic violence aggravator.

Pretrial, Witten stipulated that her statements to Deputy Heimann were not made as a result of or during custodial interrogation. At trial, the prosecutor asked Deputy Heimann and Detective Loeffelholz about Witten's behavior, demeanor, and statements she made during her arrest and booking at jail, including whether she asked any questions after her arrest.

Deputy Heimann testified that Witten did not really speak or ask him any questions during her arrest or her transport but that in the interview room, Witten asked him how Michael was doing and asked if someone could check on her dogs. Detective Loeffelholz testified that Witten did not ask him any questions about the charges and that if she had said something important he would have included it in his report.

Witten presented a defense of diminished capacity claiming a dissociative event caused by her severe post-traumatic stress disorder. Dr. April Gerlock's testimony supported this defense, allegedly caused by Michael's years of physical violence and abuse. Dr. Gerlock testified that during a dissociative event the person's brain is not connected with what their body is saying or doing. Dr. Gerlock testified that Witten's actions after the shooting were consistent

3

with her opinion that Witten did not have the intent to follow through with an intentional crime on the day of the shooting. Dr. Gerlock testified that she knew from reviewing the police reports that Witten did not ask the officers questions about who they were, or why they were contacting her, nor did Witten try to explain her circumstances after arrest, but that she did ask about Michael and her dogs. These things did not change Dr. Gerlock's opinion about Witten's dissociative event. Witten did not take the stand or present any other witnesses.

During trial, the court excused a juror who briefly spoke to a police officer during a court recess about the Maurice Clemmons case, which occurred in the Tacoma area just days before Witten shot Michael. The court interviewed the juror in question, determined that she was truthful, but excused her as an additional precaution. Witten did not object to the procedure or the removal of the juror.

Defense counsel's closing argument focused on Witten and Michael's relationship and on Dr. Gerlock's opinion that Witten did not intend to commit a criminal act due to her depression, post-traumatic stress disorder, and dissociative event. In response, during rebuttal closing, the prosecutor referred to Witten's lack of questions to the police and her statements to Deputy Heimann about Michael's conditions and her dogs. The jury found Witten guilty of all charges, including special verdicts that Witten and Michael were family members and that Witten was armed with a firearm. Witten appeals.

ANALYSIS

I. PROSECUTORIAL MISCONDUCT

Witten argues prosecutorial misconduct deprived her of a fair trial and that reversal is required because the prosecutor wrongfully elicited testimony from several witnesses and made

comments during closing argument that violated her right to remain silent and violated her fundamental right to due process. We disagree. But, as discussed below, the State did not commit misconduct in its examination of witnesses nor in its closing arguments because Witten made voluntary statements and placed her mental state at issue by raising a diminished capacity defense. Accordingly, having failed to object at trial, Witten has failed to preserve these alleged errors for appeal.

## A. Standard of Review

To establish prosecutorial misconduct, a defendant must show both improper conduct and resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). A defendant fails to preserve a prosecutorial misconduct claim for appeal when she does not object at trial to alleged misconduct, unless the misconduct is so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. This court reviews a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998).

Our Supreme Court has recognized that "'[t]he State can take no action which will unnecessarily 'chill' or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right.'" *State v. Gregory*, 158 Wn.2d 759, 806, 147 P.3d 1201 (2006) (quoting *State v. Rupe*, 101 Wn.2d 664, 705, 683 P.2d 571 (1984)). However, both the United States Supreme Court and Washington courts have recognized that not all arguments "touching upon a defendant's constitutional rights are impermissible comments on the exercise of those rights." *Gregory*, 158 Wn.2d at 806. The

State Supreme Court has characterized the relevant issue as "'whether the prosecutor manifestly intended the remarks to be a comment on that right.'" *Gregory*, 158 Wn.2d at 806-07 (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10, *cert. denied*, 501 U.S. 1237 (1991)). But when a defendant does not remain silent and instead talks to police, the State may comment on what he does not say. *State v. Clark*, 143 Wn.2d 731, 765, 24 P.3d 1006, *cert. denied*, 534 U.S. 1000 (2001).

### B. Analysis

Witten argues that the prosecutor's comments were improper because post-*Miranda* silence cannot be used as evidence to disprove mental illness, citing *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986) and *Matire v. Wainwright*, 811 F.2d 1430 (11th Cir. 1987). The State argues these cases are immediately distinguishable because the defendants in both *Greenfield* and *Matire* did not make any statements to the law enforcement officers, whereas here Witten did make a few statements. This is an important distinction that Witten fails to reconcile.

In *Greenfield*, the Supreme Court held that it was fundamentally unfair for a prosecutor to use a defendant's postarrest, post-*Miranda* silence as evidence of sanity when the defendant's theory at trial was that he was not guilty because he was insane. 474 U.S. at 285, 295. The Supreme Court reasoned that its conclusion in *Doyle v. Ohio*[4] that it was unfair for a prosecutor to breach the implicit promises of *Miranda* warnings by using the defendant's postarrest, post-*Miranda* silence to impeach his or her trial testimony compelled the same result under the facts of *Greenfield*, 474 U.S. at 295.

---

[4] *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

No. 42021-0-II

However, in *State v. Scott*, Division One of this court stated:

We see no reason why the State's right to comment upon inconsistencies between a defendant's post-*Miranda* "partial silence" and trial testimony by the defendant does not extend, with equal logic, to inconsistencies between such partial silence and defense theories pursued at trial without actual testimony from the defendant.

*State v. Scott*, 58 Wn. App. 50, 55, 791 P.2d 559 (1990). The *Scott* court explained that where a defendant waives the right to remain silent and makes a partial statement to police, the State may use the statement to impeach the defendant's subsequent defense at trial. *Scott*, 58 Wn. App. at 55. Witten alleges several instances of improper commentary. Witten did not object to any of these statements at trial.

First, Witten challenges the following from Deputy Heimann's testimony:

Q: . . . During your transport of Ms. Witten from Fort Lewis down to the County-City Building, can you describe for the jury any things that you were able to observe of her demeanor?
A: Really, no emotions, didn't really speak at all.
Q: Do you recall the—did she ask you any questions at that time?
A: No.
Q: When you placed Ms. Witten under arrest, did you—did she ask you any questions at that time?
A: No.
. . . .
Q: Now, did you observe the defendant doing anything during that time period? (while in custody in the patrol car)
A: No, I did not.
Q: Okay. And during that time period, did she ask you any questions?
A: No, [she] didn't.

5 VRP at 591, 593.

This testimony highlighted only that the defendant asked no questions between the time of arrest and the time of arrival at the police station. This was not a direct comment on the defendant's silence and the prosecutor in closing argument did not suggest to the jury that this silence was an admission of guilt. Instead, this testimony was impeachment to show Witten was

not suffering from confusion shortly after the shooting. We conclude this was not a comment on Witten's silence.

Second, Witten also argues the following testimony of Deputy Heimann was improper:

Q: . . . [D]uring the times that you were alone with Ms. Witten while she was in the interview room, can you describe for the jury what her demeanor was?
. . . .
A: . . . She did not cry, didn't really show any emotion. When the detectives left the room, she cried. She was shaking. She asked me to check on Michael, and she asked me to check on her dogs.

5 VRP at 594.

This testimony was a simple description of Witten's demeanor and recounted the voluntary statements that Witten made post-*Miranda*. Accordingly, this testimony was not an improper comment on Witten's right to remain silent.

Third, Witten challenges Detective Loeffelholz's following testimony:

Q: . . . [D]id you have an opportunity to speak with Ms. Witten in the interview room?
A: Briefly.
. . . .
Q: Did you advise [Witten] what it was that she was under arrest for?
A: I did.
Q: And did she ask you any questions about the charges that you—that you indicated to her?
A: I don't recall.
Q: If she had said something, is that something that you would have indicated in your report?
A: If it was significant, I would have.

6 VRP at 736, 738.

This testimony was only a brief mention that Witten did not say anything. The main point of this testimony was that Witten did not ask any questions that the officer could recall, and

8

that if she had said anything significant, he would have included it in his report. This brief testimony does not rise to the level of a direct comment on Witten's right to remain silent.

Fourth, Witten challenges Dr. Gerlock's cross-examination testimony:

Q: And then her contact with the police—at no point in time in the records, or based off of your conversation with . . . Witten, did she tell you that she asked the officers who they were?
A: No. I don't believe so, no.
Q: Okay. And at no point in time did she share with you or include in the police reports that would indicate that she asked why they were contacting her?
A: She thought they were pulling her over for harassment.
Q: Okay. But she didn't express that. She didn't ask them if they were pulling her over for harassment, did she?
A: No, not at the time, no.
Q: Okay. And so you've indicated that she says that she thought that they were pulling her over for harassment?
Q: Yes.
Q: Okay. So that's an exercise in assessing the situation and then coming up with the reason for the contact[,] right?
A: Correct. Yeah.

. . . .

Q: Okay. And apparently, when she is talked to by the detectives, she didn't try to explain her circumstances or that she doesn't remember or anything like that to them?
A: I don't believe so, no.
Q: . . . [B]ased off what's in the police reports, she did ask an officer to check on Michael, didn't she?
A: Yes.
Q: And she also asked the officer to check on her dogs?
A: Yes. I believe so, yeah.
Q: And that would also presume that she has the, at least, cognitive ability to recognize that she's not at home with the dogs; the dogs need some care?
A: Correct.

7 VRP at 982-84.

This testimony was elicited to attack the basis of the expert's opinion that Witten suffered diminished capacity at the time of the shooting. Accordingly, it was not a direct comment on

Witten's right to remain silent, and it was not used as substantive evidence of guilt or argued that

Witten's failure to ask questions was an admission of guilt.

Finally, Witten challenges a portion of the State's rebuttal closing argument that relied on

the above testimony. When discussing that Witten was able to follow Deputy Heimann's

commands, the State explained:

> That requires not only thought process but the ability to move one's body in response to the command, and then he talks with her right when he arrests her. They bring her down to talk with the detectives; and when she's down there talking with the detectives and with Deputy Heimann, at no point in time did she ever ask them, ["][W]hat are you doing? Why are you talking to me? What's going on?["]
> If you're fuzzy, don't you—I don't understand. Why are you arresting me? What are you accusing me of? What do you think I've done? None of that, nothing to explain, look, I'm confused. I don't know where I am. I don't know how I got here. I don't know who you are. None of that. When she gets down to the station, she says two things to Deputy Heimann. Would you have someone check on Michael? Deputy Heimann did not tell her—he told you he did not tell her anything about Michael because he didn't know about Michael's condition.
> . . . He didn't know that. She knew that; and that's why she asked Deputy Heimann to check on Michael but then in the same breath asked, ["]Can somebody also check in on the dogs?["]

8 VRP at 1100-02.

Here, the theory that Witten argued was that she was experiencing a dissociative event

and that she did not know what was going on at the time of the shooting. But her actions at the

time of arrest and questioning could indicate otherwise. Witten's statements and her partial

silence created an inference that her theory at trial was fabricated, permitting the State to so

argue. *Scott*, 58 Wn. App. at 55. The State properly argued that Witten was able to follow the

arresting officers commands, that she did not appear to be confused about why the police

arrested her, that she seemed to understand what was going on, that she asked no questions about

what was happening, but that she did ask about Michael's condition and that someone check on

her dogs. This was proper impeachment argument addressing Witten's theory at trial that she was experiencing a dissociative event.

Further, the prosecutor's comments during rebuttal closing were responsive to the defense's closing argument. Defense's closing argument focused on Witten and Michael's relationship and on Dr. Gerlock's opinion that Witten could not have intended a criminal act due to her depression, post-traumatic stress disorder, and dissociative event. Defense counsel explained Witten as experiencing "an unusual sensation" at the time of the shooting and that she felt like her ears were plugged up, that she knew Michael was there, that she could not see his face, that she did see brown carpet and hear something shatter, that she felt Michael touching her, that she did not see Meuangkhot, and that she did not recall leaving. 8 VRP at 1093.

The prosecutor's statements in rebuttal closing that she was actually able to move her body in response to Deputy Heimann's commands and that she appeared to understand where she was and what was going on after being arrested were responsive to defense counsel's closing. They were also reasonable inferences from the evidence and well within a prosecutor's "wide latitude in making arguments to the jury." *Gregory*, 158 Wn.2d at 860. Thus, the prosecutor's comments on Witten's partial postarrest silence did not amount to misconduct. Because Witten placed her mental state at issue when she raised a diminished capacity defense, and because Witten did make some statements after advice of *Miranda* warnings, we hold the prosecutor did not improperly comment on her right to remain silent. Accordingly Witten failed to preserve these errors for appeal.

## II. STATEMENT OF ADDITIONAL GROUNDS: JURY BIAS

Witten asserts that statements and conduct of a particular juror tainted the jury, and that a high-profile shooting crime occurring contemporaneously with Michael's shooting prevented the jury from rendering an impartial decision. We disagree.

We review the trial court's determination of whether to dismiss a juror for abuse of discretion. *State v. Depaz*, 165 Wn.2d 842, 852, 204 P.3d 217 (2009). Abuse of discretion exists when a trial court bases its discretion on untenable grounds or reasons. *Depaz*, 165 Wn.2d at 852 (citing *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). "Deciding whether juror misconduct occurred and whether it affected the verdict are matters for the discretion of the trial court, and will not be reversed on appeal unless the court abused its discretion." *Breckenridge v. Valley Gen. Hosp*, 150 Wn.2d 197, 203, 75 P.3d 944 (2003).

Witten alleges that a juror committed misconduct by speaking with a police officer outside the courtroom, off the record and that "damage to [her] case was done" because she is unaware of what the juror told the rest of the jury after she spoke with the officer. Statement of Additional Grounds (SAG) at 2. Upon defense motion to dismiss the juror, the court interviewed the juror, determined that her ability to be a juror in the case was not impaired, but as an additional precaution, the court excused her from the jury. The record shows that the juror reported that she had spoken to a police officer, who may have been a witness at Witten's trial, about the Clemmons case. The juror testified that the two did not speak about anything that had to do with Witten's case, that she had told the rest of the jury that she had spoken to a police officer, and that she also informed them that it had nothing to do with Witten's case.

No. 42021-0-II

While Witten asserts that the juror told the entire jury something that apparently prejudiced the whole jury, the court found the juror to be truthful when she testified that she had not talked to the officer about Witten's case. Witten does not argue that any specific prejudice resulted, only that "damage to [her] case was done." SAG at 2. Witten fails to show that the trial court's decision to excuse the juror and its determination that no prejudice occurred was manifestly unreasonable or based on untenable grounds. *Powell*, 126 Wn.2d at 258.

Witten also asserts that the jury was negatively influenced and biased because she was incarcerated with individuals related to Clemmons and because of similarities between her case and the Clemmons case. Because the record does not show if or how the jury was biased, Witten must rely on matters outside the record to support her argument. We do not consider arguments that rely on facts outside the record. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, A.C.J.

We concur:

Quinn-Brintnall, J.

Bjorgen, J.

13